UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-cr-00018-MMD-CLB |
| Plaintiff, | ORDER |
| v. | |
| MANUEL SALVADOR GIL-SOLANO, | |
| Defendant. | |

## I.   SUMMARY

Defendant Manuel Salvador Gil-Solano has been indicted on one count of being an undocumented immigrant in possession of firearms under 18 U.S.C. § 922(g)(5)(A). (ECF No. 1.) Gil-Solano filed a motion to dismiss his indictment ("Motion") because the underlying statute violates both the Second Amendment and the equal protection component of the Fifth Amendment. (ECF No. 21.[1]) As explained below, the Court will deny Gil-Solano's Motion.

## II.   BACKGROUND

On April 6, 2023, a federal grand jury indicted Gil-Solano on one count of possessing firearms as a prohibited person in violation of 18 U.S.C. § 922(g)(5)(A). (ECF No. 1 ("Indictment").) The Indictment alleges that Gil-Solano knowingly possessed seven firearms shipped and transported in interstate and foreign commerce, despite knowing that he was "an alien illegally and unlawfully in the United States." (*Id.*)

/ / /

---

[1] The government filed an opposition (ECF No. 25) and Gil-Solano replied (ECF No. 26). The Court set a hearing on the Motion (ECF No. 33) and directed supplemental briefing (ECF No. 34). The Court heard oral argument after the parties filed supplemental briefs (ECF Nos. 35, 37). (ECF No. 38.)

III.    **DISCUSSION**

Gil-Solano moves to dismiss the charge against him on two constitutional grounds. (ECF No. 21.) He first alleges that 18 U.S.C. § 922(g)(5)(A) fails the 'historical tradition' test articulated in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), because the nation does not have a well-established tradition of categorically disarming undocumented immigrants, and thus § 922(g)(5)(A) violates the Second Amendment. (*Id.* at 2, 4-27.) He then asserts that § 922(g)(5)(A) is also unlawfully discriminatory against undocumented immigrants in violation of the equal protection component of the Fifth Amendment. (*Id.* at 28-37.) The Court denies Gil-Solano's Motion on both grounds.

**A.    Second Amendment**

28 U.S.C. § 922(g)(5)(A) makes it is unlawful for "an alien . . . illegally or unlawfully in the United States . . . [to] possess in or affecting commerce, any firearm." Such restrictions on access to firearms must be assessed against the Second Amendment right to keep and bear arms. *See* U.S. CONST. amend II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.").

The Supreme Court in *Bruen* recently issued a new, shortened test for determining whether firearms regulations violate the Second Amendment. *See* 142 S. Ct. at 2126. Courts must first determine the threshold matter of whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct." *Id.* But a regulation may still be upheld if the government can demonstrate that it is "consistent with this Nation's historical tradition of firearm regulation." *Id.* The Court will now analyze the Motion under each prong of the *Bruen* test.

**1.    Plain Text of the Second Amendment**

The Second Amendment enshrines "the right of *the people* to keep and bear Arms." U.S. CONST. amend II (emphasis added). The government argues that undocumented immigrants are not included within 'the people' afforded Second

1   Amendment protections because their unlawful presence in the United States inherently

2   disqualifies them from being "law-abiding citizens." (ECF No. 25 at 4-10 (citing *Bruen*,

3   142 S.Ct. at 2159 (Alito, J. concurring)).) Gil-Solano, to the contrary, contends that the

4   Second Amendment covers all members of this nation's political community, including

5   some undocumented immigrants. (ECF Nos. 21 at 8-10, 26 at 4-12, 37 at 21.)

6          The Supreme Court has not yet explicitly delimited the scope of 'the people' whom

7   the Second Amendment protects. *See United States v. Sitladeen*, 64 F.4th 978, 984 (8th

8   Cir. 2023) (noting that *Bruen* left undefined 'the people' to whom Second Amendment

9   rights extend). The Court's 2008 decision in *District of Columbia v. Heller* indicated that

10  'the people' may have the same meaning under the First, Second, and Fourth

11  Amendments, and therefore the right to bear arms extends to "a class of persons who are

12  part of a national community or who have otherwise developed sufficient connection with

13  this country to be considered part of that community." 554 U.S. 570, 580 (2008) (quoting

14  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). But the majority in *Heller*

15  also implied that the Second Amendment right is not universal even among U.S. citizens,

16  as restrictions on firearms possession by "felons and the mentally ill" are presumptively

17  valid. *Id.* at 626. Given these "conflicting pronouncements," *id.* at 644 (Stevens, J.

18  dissenting), it is unclear whether the repeated references to "law-abiding citizens" in the

19  Supreme Court's Second Amendment jurisprudence[2] are meant to refer to only the core

20  Second Amendment right or to define the right's entire scope, *compare id.* ("[T]he Court

21  limits the protected class to 'law-abiding, responsible citizens.'"), *with United States v.*

22  *Meza-Rodriguez*, 798 F.3d 664, 669-70 (7th Cir. 2015); *Range v. Att'y Gen. U.S. of Am.*,

23  69 F.4th 96, 101-03 (3d Cir. 2023) (en banc).

24         Post-*Heller*, several federal courts have addressed whether the plain text of the

25  Second Amendment includes undocumented immigrants. The Seventh Circuit is the only

26  circuit court which has held that undocumented immigrants are included within the

27

28         [2]*See, e.g., Heller*, 554 U.S. at 625, 635; *McDonald v. City of Chicago, Ill.*, 561 U.S.
    742, 790 (2010); *Bruen*, 142 S.Ct. at 2122, 2131, 2133-34, 2156.

1  meaning of 'the people' under the Second Amendment. *See United States v. Meza-*
2  *Rodriguez*, 798 F.3d at 672. Three circuits have found that 'the people' excludes
3  undocumented immigrants in the Second Amendment context. *United States v. Carpio-*
4  *Leon*, 701 F.3d 974, 981 (4th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437,
5  440 (5th Cir. 2011); *United States v. Sitladeen*, 64 F.4th at 985-87 (upholding *United*
6  *States v. Flores*, 663 F.3d 1022 (8th Cir. 2011)). And four circuit courts – including the
7  Ninth Circuit – have assumed, without deciding, that 'the people' includes undocumented
8  immigrants. *United States v. Perez*, 6 F.4th 448, 450 (2d Cir. 2021), *cert. denied*, 142 S.
9  Ct. 1133 (2022); *United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019); *United*
10 *States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *United States v. Jimenez-*
11 *Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022).

12      Given the "large and complicated" questions in this field, the ambiguity of
13 controlling precedent, and the canon of constitutional avoidance, the Court will follow the
14 Ninth Circuit's lead and assume, without deciding, that "unlawful aliens . . . fall within the
15 scope of the Second Amendment right as articulated under *Heller* and *Vergudo-*
16 *Urquidez*," and now also *Bruen*. *Torres*, 911 F.3d at 1261.

17          **2.    *Bruen*'s 'Historical Tradition' Test**

18      *Bruen* now requires the Court to assess whether § 922(g)(5)(A) is "consistent with
19 this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126. For the Court to
20 uphold § 922(g)(5)(A), the government must demonstrate that the provision has a "well-
21 established and representative historical analogue,"[3] though they need not identify a

22

23  [3]The Court reads controlling caselaw as mandating that the government provide
   historical analogues but not requiring direct citations to analogous historical statutes in
24 the government's briefs. *See Bruen*, 142 S.Ct. at 2130 n.6, 2150 (holding that courts are
   "entitled to decide a case based on the historical record compiled by the parties" and "are
25 not obliged to sift the historical materials for evidence"); *Teter v. Lopez*, 76 F.4th 938,
   950-51 (9th Cir. 2023) ("Hawaii may meet its burden by citing analogous regulations.");
26 *Baird v. Bonta*, _ F.4th _, 2023 WL 5763345, at *3. *8 (9th Cir. Sept. 7, 2023) ("A district
   court should not try to help the government carry its burden by sifting historical materials
27 to find an analogue . . . The principle of party presentation instead requires the court to
   rely on the parties to frame the issues for decision." (cleaned up)). The Court accordingly
28 relies upon only the government's briefs and directly cited cases in establishing the
   relevant historical record. Though this historical record was technically sufficient, the

1  "historical twin." *Id.* at 2133. Two "central" inquiries in determining whether § 922(g)(5)(A)

2  and historical gun ownership restrictions are "relevantly similar" are (1) whether §

3  922(g)(5)(A) and historical restrictions "impose a comparable burden on the right of armed

4  self-defense" and (2) "whether that burden is comparably justified." *Id.* at 2132-33.

5  The government presents several historical statutes which it contends are

6  analogous to § 922(g)(5)(A). Some of these laws are race- and religion-based prohibitions

7  on firearms ownership. (ECF No. 35 at 5-9.) *See also United States v. DaSilva*, No. 3:21-

8  CR-267, 2022 WL 17242870, at *9 (M.D. Pa. Nov. 23, 2022). Others are Founding-era

9  prohibitions on gun possession by anyone who refused to swear an oath of loyalty to the

10  sovereign. (*Id.* at 5-9.) Status-based prohibitions are reprehensible, unconstitutional, and

11  not analogous to § 922(g)(5)(A); however, the Court finds that the colonial tradition of

12  imposing oath-based restrictions on the possession of firearms is relevantly similar to §

13  922(g)(5)(A), such that it is consistent with the Second Amendment.

14  ### a.    Status-Based Historical Laws

15  In support of § 922(g)(5)(A), the government cites cases discussing colonial laws

16  which banned gun ownership by Native Americans, law-abiding slaves, free blacks, and

17  Catholics. (ECF Nos. 25 at 7-9, 35 at 5-9.) The enacting legislatures' justifications for

18  these status-based prohibitions on firearms possession are not only distinct from those

19  underlying § 922(g)(5)(A) but are also blatantly unconstitutional. *See Range v. Att'y Gen.*

20  *U.S.*, 53 F.4th 262, 276 n.18 (3d. Cir. 2022) ("The status-based regulations of this period

21  are repugnant (not to mention unconstitutional), and we categorically reject the notion

22  that distinctions based on race, class, and religion correlate with disrespect for the law.");

23  *United States v. Leveille*, __ F.Supp.3d __, 2023 WL 2386266, at *3 n.3 (D.N.M. Mar. 7,

24  2023); *United States v. Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at *4-5

25  (M.D. Tenn. June 21, 2023). Historical status-based laws are not sufficiently analogous

26  to uphold § 922(g)(5)(A) under *Bruen*.

27

28  Court would appreciate a clearer record with direct citations to analogous statutes moving
forward, especially for matters of constitutional importance like the case at hand.

### b.    Historical Laws Requiring Oaths of Allegiance

The government also contends that § 922(g)(5)(A) is relevantly similar to Founding-era laws prohibiting the possession of firearms by those who did not swear an oath of allegiance to the sovereign. (ECF Nos. 25 at 7-9, 35 at 5-9.) Below is a rendition of the most relevant history. *See Bruen*, 142 S.Ct. at 2136 (implying that historical evidence near in time to the Second Amendment's adoption in 1791 is the most illuminating as to the scope of the right).

Before the founding of this country, colonial governments often "prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms." *Jimenez-Shilon*, 34 F.4th at 1047-48 (quoting ADAM WINKLER, GUN FIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 116 (2011)). This practice of conditioning people's ability to keep and bear arms on their "undivided allegiance to the sovereign" continued as the American Revolution gained favor and "people who didn't support the Revolution were ordered to turn over their guns." *Id*. at 1048.

Along this same vein, individual states prohibited firearms ownership for those who did not swear an oath of allegiance to the state. In 1777, the Pennsylvania legislature enacted a statute which mandated that all white male inhabitants over the age of eighteen "shall be disarmed" if they did not "swear to 'be faithful and bear true allegiance to the commonwealth of Pennsylvania.'" *Range*, 53 F.4th at 278 (quoting Act of June 13, 1777, § 1 (1777), in 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1652–1801 110, 111-13 (William Stanley Ray ed., 1903)); *accord Escobar-Temal*, 2023 WL 4112762, at *5. Though this statute was enacted prior to the Second Amendment, the Pennsylvania Constitution contained a similar individual right to bear arms. *See Escobar-Temal*, 2023 WL 4112762, at *5 n.6.

Virginia, too, passed a law that same year which "disarmed 'all free born male inhabitants of this state' . . . who refused to swear their 'allegiance and fidelity' to the state." *Range*, 53 F.4th at 279 (quoting An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiances to the Same, and for Other

Purposes ch. III (1777), in 9 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 281 (William W. Hening ed., 1821));[4] *accord Escobar-Temal*, 2023 WL 4112762, at *5. The analogical fit of this statute is diminished by the fact that the Virginia Constitution did not contain a right to bear arms, *see Escobar-Temal*, 2023 WL 4112762, at *5 n.6; however, the Court finds that Virginia's loyalty oath requirement still evinces a tradition of disarming those who have not formally sworn an oath of allegiance.

Several other states also preconditioned the right to bear arms on swearing an oath of allegiance.[5] *See Perez*, 6 F.4th at 462 (Menashi, J. concurring); *see also Range*,

---

[4]This opinion was vacated when the Third Circuit granted rehearing en banc. *Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023). However, the en banc panel did not reject the accuracy of this recitation of colonial Virginia laws, *see Range*, 69 F.4th at 103-06, and the Middle District of Tennessee cited to this language in *Escobar-Temal*, one of the cases upon which the government relies. (ECF Nos. 25 at 7, 35 at 8.) *See also* 2023 WL 4112762, at *5. The Court thus finds it instructive.

[5]After a brief examination of Second Amendment jurisprudence and law review articles, the Court located several additional possibly analogous statutes. In 1776, Massachusetts passed an act that required "'every Male Person above sixteen Years of Age' to subscribe to a 'test' of allegiance to the 'United American Colonies'" and completely disarmed "such Persons as are notoriously disaffected to the Cause of America, or who refuse to associate to defend by Arms the United American Colonies." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 507 (2004) (quoting Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31-32 (1776)). Maryland instituted a test oath in 1777, and those who refused to swear their fidelity to the state were barred from keeping arms. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 160 (2007) (citing an Act for the Better Security of the Government, ch. XX, Md. Laws (1777); An Act to Prevent and Suppress Insurrections, Md. Laws (1778); An Act to Raise Two Battalions of Militia for Reinforcing the Continental Army, Md. Session Laws (1781)). North Carolina similarly barred "non-testors from basic liberties including the keeping of arms while promising that any who relented would be 'held and deemed a good subject of this state, and shall enjoy the privileges thereof.'" *Id.* (citing An Act for Directing the Method of Appointing Jurors, N.C. Session Laws (1777)). Rhode Island, New Jersey, and even the Continental Congress also prohibited possession of firearms by those who "refused to declare an oath of loyalty" during the Revolutionary War era. *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (citing *4 Journals of the Continental Congress*, 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906); Act of June 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862); Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90). The Court does not rely upon any of these historical statutes, as judges are not "pigs, hunting for truffles buried in briefs," *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)), and it is the burden of the government – not the Court – to establish a sufficient historical record, *see Baird*, 2023 WL 5763345,

1    69 F.4th at 111 (Ambro, J. concurring). The Court accordingly finds that there was a "well-
2    established" tradition of barring firearms possession for those who did not swear their
3    loyalty to the government. *Bruen*, 142 S.Ct. at 2133; *cf. id.* at 2153 (rejecting two statutes
4    as outliers in assessing whether a *state* firearms restriction violated the Second
5    Amendment, as incorporated by the Fourteenth Amendment); *Teter*, 76 F.4th at 952
6    (same for one historical statute).

7         Gil-Solano contests that a counter-tradition of immigrant armament during the
8    Founding era undermines any finding that there was a Founding-era tradition of loyalty
9    oath-based prohibitions on firearms possession, such that the evidentiary record is left in
10   "equipoise." (ECF Nos. 21 at 20-22, 37 at 6, 20.) *See also Simmons v. Blodgett*, 110 F.3d
11   39, 42 (9th Cir. 1997). But arming immigrants and disarming those who have not sworn
12   allegiance to the sovereign are not mutually exclusive policies. Gil-Solano himself has
13   identified that Pennsylvania both prohibited firearms possession by persons who did not
14   swear an oath of loyalty to the commonwealth and mandated that the "freemen of [the]
15   commonwealth shall be armed and disciplined for its defence [*sic*]." (ECF No. 21 at 18,
16   21 n.9 (quoting PA. CONST. art. VI, § II (1790).) This historical record mirrors current
17   federal gun laws: non-citizens are not categorically denied the right to bear arms—and
18   may even have an affirmative Second Amendment right—unless they are unlawfully
19   present and thus have not formally sworn allegiance to the United States. *See* 18 U.S.C.
20   § 922(g)(5)(A).

21        Relative to § 922(g)(5)(A), early American laws requiring loyalty oaths imposed
22   comparable burdens on firearms possession, with comparable justifications. *See Bruen*,
23   142 S.Ct. at 2133. Both § 922(g)(5)(A) and these historical analogues completely restrict
24   access to guns. And oath-based historical firearms restrictions, like § 922(g)(5)(A), were
25   enacted due to the legislatures' views that "providing firearms to those who have not
26   demonstrated allegiance to this nation might put weapons in the hands of those who

27

28   at *3; *Bruen*, 412 S.Ct. at 2150. The Court references these additional analogous statutes
     to show that the government could have more effectively supplemented its response.

would do the nation harm." *Leveille*, 2023 WL 2386266, at *4. These allegiance-based classifications are admittedly rough, flawed attempts to distinguish between those who are likely to "comply with certain communal obligations" and "abide by the norms of civic society" and those who are unlikely to do so. *Escobar-Temal*, 2023 WL 4112762, at *5-6; *see also Binderup v. Att'y Gen. U.S. Am.*, 836 F.3d 336, 390-91 (3d Cir. 2016) (en banc) (Fuentes, J. concurring in part). But they are relevantly similar, nonetheless.

Gil-Solano raised during oral argument that § 922(g)(5)(A) and oath-based prohibitions are distinct because most undocumented immigrants are unlawfully present due to their lack of a legitimate opportunity to swear an oath of allegiance to the United States, not a lack of loyalty to the country. This point does not reflect upon the comparability of historical oath-based analogues, but rather is a concern Gil-Solano has with our nation's immigration policy. *See Escobar-Temal*, 2023 WL 4112762, at *6. For better or worse, immigration laws are the "imperfect system the United States has set up as a proxy for national allegiance." *Leveille*, 2023 WL 2386266, at *4. Therefore, despite not being a perfect match, historical laws banning firearms ownership for those who refused to swear allegiance to the sovereign are analogous to § 922(g)(5)(A)'s prohibition directed at undocumented immigrants. *See Bruen*, 142 S.Ct. at 2133 (holding that the historical analogue need not be a "historical twin" or "dead ringer").

Any other differences that Gil-Solano has identified between these oath-based statutes and § 922(g)(5)(A) are either inaccurate or non-dispositive here. (ECF No. 37 at 14-19.) The government has established that § 922(g)(5)(A) is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2135.

The Court denies Gil-Solano's Motion on Second Amendment grounds.

**B.    The Fifth Amendment Equal Protection Component**

Gil-Solano also argues that § 922(g)(5)(A) violates the equal protection component of the Fifth Amendment Due Process Clause by denying him a fundamental right based upon his immigration status. (ECF No. 21 at 4.) There is no dispute that undocumented immigrants are 'persons' entitled to Fifth Amendment protections. *See Mathews v. Diaz*,

426 U.S. 67, 77 (1976); U.S. CONST. amend. V (No person shall . . . be deprived of life, liberty, or property, without due process of law."). "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). The threshold assessment in equal protection analysis is whether persons similarly situated are treated differently. *See Harrison v. Kernan*, 971 F.3d 1069, 1075 (9th Cir. 2020). If there is disparity in treatment among similarly situated groups, legislation is still presumed to be valid if it is rationally related to a legitimate state interest, unless the statute draws a classification that disadvantages a suspect class or implicates a fundamental right. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982). Because § 922(g)(5)(A) is a federal law which neither violates the Second Amendment nor disadvantages a suspect class, rational-basis review applies.

### 1.     Similarly Situated

For "state action to trigger equal protection review at all, that action must treat similarly situated persons disparately." *Silveira v. Lockyer*, 312 F.3d 1052, 1088 (9th Cir. 2002), *abrogated on other grounds by Heller*, 554 U.S. 570.[6] People are 'similarly situated' when their circumstances are practically "indistinguishable," *Ross v. Moffitt*, 417 U.S. 600, 609 (1974), or "in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). While, here, unlawfully present individuals do not need to be "similar in all respects" to groups not categorically prohibited from possessing firearms, "they must be similar in those respects that are relevant to [the United States'] own interests and its policy." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) (en banc).

The government asserts that undocumented non-citizens and law-abiding citizens are not similarly situated because only the latter possess Second Amendment rights.

---

[6]The Court cites to Fourteenth Amendment Equal Protection Clause caselaw throughout, as "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976); *accord United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023).

(ECF No. 25 at 13.) Since the Court assumes without deciding that at least some undocumented immigrants have Second Amendment rights, this argument is unavailing.

Gil-Solano is correct that documented immigrants are a better control group here. (ECF No. 37 at 20.) *See also Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018). And if the right to keep and bear arms extends to both documented and undocumented immigrants, then the only relevant difference between Gil-Solano and a lawfully present immigrant who has lived in the United States for the same amount of time, when it comes to their ability to possess firearms, is their documentation status. *See Harrison*, 971 F.3d at 1076. The Court accordingly assumes without deciding that undocumented and documented immigrants are similarly situated for the purposes of resolving Gil-Solano's equal protection challenge.

## 2.    Appropriate Level of Scrutiny

Irrespective of whether documented and undocumented immigrants are similarly situated, § 922(g)(5)(A) still qualifies for and passes rational-basis scrutiny. Unless legislation draws a classification that "disadvantages a 'suspect class' or impinges a 'fundamental right,'" statutes are presumed to pass constitutional muster and will be upheld if the classification at issue is "rationally related to a legitimate state interest." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (quoting *Plyler*, 457 U.S. at 216-17). Heightened scrutiny is also available in "limited circumstances" where classifications that are not facially invidious give rise to recurring constitutional difficulties. *Plyler*, 457 U.S. at 217. None of these bases for heightened scrutiny is applicable here, and therefore rational-basis review applies.

### a.  Fundamental Right

Even assuming Gil-Solano has access to fundamental Second Amendment rights, that cannot be the basis for applying strict scrutiny. "To the extent that the [Fifth Amendment equal protection] challenge is based on the Second Amendment's fundamental right to bear arms and the disparate treatment of groups in exercising that right . . . that challenge is subsumed in the Second Amendment inquiry above." *Pena v.*

1   *Lindley*, 898 F.3d 969, 986 (9th Cir. 2018); *accord Teixeira v. Cnty. of Alameda*, 822 F.3d

2   1047, 1052 (9th Cir. 2016), *aff'd on reh'g en banc*, 873 F.3d 670, 676 n.7 (9th Cir. 2017);

3   *Torres*, 911 F.3d at 1265 n.7. As already discussed, § 922(g)(5)(A) is consistent with the

4   Second Amendment given the nation's history and tradition of prohibiting firearms

5   possession by people who did not swear their allegiance to the sovereign. Strict scrutiny

6   does not apply based upon § 922(g)(5)(A) restricting the exercise of a fundamental right.

7                                       **b.  Suspect Class**

8           Undocumented immigrants are not a suspect class. *See Plyler*, 457 U.S. at 219

9   n.19, 223. And whether § 922(g)(5)(A) discriminates based upon alienage is immaterial,

10  as federal alienage classifications are subject to rational-basis review. *See United States*

11  *v. Ayala-Bello*, 995 F.3d 710, 715 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 513 (2021);

12  *Hamad v. Gates*, 732 F.3d 990, 1105 (9th Cir. 2013).

13          Gil-Solano argues that § 922(g)(5)(A) still warrants strict scrutiny because it uses

14  documentation status as a proxy for race.[7] (ECF No. 21 at 31-32.) Sufficient alignment

15  between a statutorily defined group and a suspect classification for which it is a proxy can

16  render statutes unconstitutional. *See Pac. Shores Props., LLC v. City of Newport Beach*,

17  730 F.3d 1142, 1160 n.23 (9th Cir. 2013). Proxy discrimination "does not require an exact

18  match," but the alleged proxy must be "so closely intertwined with race" that it is "readily

19  understood to be discriminatory in purpose and operation." *Davis v. Guam*, 932 F.3d 822,

20  838 (9th Cir. 2019) (quotations omitted); *accord Pac. Shores Props.*, 730 F.3d at 1160

21  n.23 (holding that criteria must be "almost exclusively indicators of membership in the

22  disfavored group" to constitute proxy discrimination).

23          Section 922(g)(5)(A) does not meet this standard. Immigrant demographics have

24  changed drastically in the United States since § 922(g)(5)(A) was enacted in 1968. *See*

25  Campbell J. Gibson & Emily Lennon, U.S. Census, Historical Census Statistics on the

26  _____

27          [7]Despite raising concerns about the history surrounding the enactment of §
    922(g)(5)(A) in his Motion, Gil-Solano clarified at oral argument that he is not arguing §
    922(g)(5)(A) was enacted with discriminatory intent under *United States v. Carrillo-Lopez*
28  and related cases. *See* 68 F.4th 1133.

1  FOREIGN-BORN POPULATION OF THE UNITED STATES: 1850-1990, Table 2 (1999),

2  https://perma.cc/6BZA-USNR (showing significant differences in the regions of birth of

3  the foreign-born U.S. population between 1970 and 1990). And where immigrants to the

4  United States were born will almost certainly continue to change. The immigrant

5  population's demonstrably dynamic demographic composition leads the Court to find that

6  documentation status[8] and race are not so closely intertwined that § 922(g)(5)(A) is

7  readily understood to intentionally target non-white immigrants. *Cf. Guam*, 932 F.3d at

8  839; *Hecox v. Little*, 79 F.4th 1009, 1024-25 (9th Cir. 2023).

9     Strict scrutiny does not apply because of § 922(g)(5)(A)'s differential treatment of

10  a suspect class.

11     **c. Heightened Scrutiny Under *Plyler***

12     Gil-Solano further asserts that § 922(g)(5)(A) qualifies for heightened scrutiny

13  under *Plyler*. (ECF No. 21 at 34.) But *Plyler* is "inapposite" because § 922(g)(5)(A) is a

14  federal, not state, law. *Aleman v. Glickman*, 217 F.3d 1191, 1198 (9th Cir. 2000). Section

15  922(g)(5)(A) is ineligible for heightened scrutiny, and rational-basis review applies.

16     **3.     Applying Rational Basis Review**

17     Rational-basis review requires only that there is "a rational relationship between

18  the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by

19  Doe*, 509 U.S. 312, 320 (1993). Reviewing courts must uphold challenged statutes if there

20  is "any reasonably conceivable state of facts that could provide a rational basis for the

21  classification." *Id.* The party asserting an equal protection claim bears the burden of

22  negating "every conceivable basis which might support" the challenged law. *F.C.C. v.

23  Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993).

24     The Ninth Circuit has held that prohibiting unlawfully present immigrants from

25  possessing firearms is rationally related to the legitimate governmental interest in

26  _____

27  [8]Similar historical data regarding the demographics of undocumented immigrants was not provided to the Court and is not readily available. The Court uses the general immigrant population as a rough proxy for the undocumented population, though there are likely differences in the historical make-ups of the two.

28

13

1   protecting public safety.[9] *See Torres*, 911 F.3d at 1263-64. Monitoring undocumented

2   immigrants and their firearms is generally more difficult because people unlawfully in this

3   country have an "incentive to falsify information and evade law enforcement," *id.* at 1264,

4   and may also be more likely to acquire firearms via "illegitimate and difficult-to-trace

5   channels," *Sitladeen*, 64 F.4th at 989. And "armed, unlawful aliens could pose a threat to

6   . . . law enforcement who attempt to apprehend and remove them." *Torres*, 911 F.3d at

7   1264. Gil-Solano's contentions to the contrary fail to negate "every conceivable basis" of

8   support for § 922(g)(5)(A). *Beach Commc'ns*, 508 U.S. at 315. Regardless of

9   undocumented immigrants' propensity for crime or lack thereof, (ECF No. 21 at 35-36),

10  Gil-Solano does not address concerns about the difficulty of monitoring firearms sales to

11  undocumented immigrants.

12         Gil-Solano has failed to demonstrate that Congress acted without any rational

13  basis in prohibiting unlawful immigrants from possessing firearms. Section 922(g)(5)(A)

14  survives rational-basis review.

15         For these reasons, the Court denies the Motion.

16  **IV.    CONCLUSION**

17         The Court notes that the parties made several arguments and cited several cases

18  not discussed above. The Court has reviewed these arguments and cases and

19  determines that they do not warrant discussion, as they do not affect the outcome of the

20  motions before the Court.

21         It is therefore ordered that Defendant Manuel Salvador Gil-Solano's motion to

22  dismiss (ECF No. 21) is denied.

23  / / /

24  / / /

25  / / /

26

27         [9]The Ninth Circuit in *Torres* reached this conclusion while applying a balancing test
28  that has since been abrogated by *Bruen*. Though the balancing test is no longer good
    law, the Court finds that the Ninth Circuit's conclusions as to the legitimacy of the
    government interest and its relationship to § 922(g)(5) remain sound, especially
    considering that the court applied the higher standard of intermediate scrutiny.

DATED THIS 16th Day of October 2023.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE